**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 16, 2007**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 03-40980

LESTER LEROY BOWER, JR.,

Petitioner-Appellant,

versus

NATHANIEL QUARTERMAN, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent-Appellee.

Appeal from the United States District Court
for the Eastern District of Texas

Before SMITH, DeMOSS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Lester Leroy Bower, Jr. ("Bower"), a death row inmate, appeals the district court's denial

of his petition for writ of habeas corpus. The district court granted Bower a Certificate of

Appealability ("COA") on his ineffective assistance of counsel claims and his *Brady* claim. Finding

no error in the district court's denial of Bower's petition on these issues, we affirm.

I. FACTUAL AND PROCEDURAL BACKGROUND

Bobby Tate, Philip Good, Ronald Mayes, and Jerry Brown were shot in an ultralight hangar

in Grayson County, Texas, on October 8, 1983. Law enforcement officers learned that Tate had been trying to sell an ultralight airplane and that Good was helping him find a buyer. By investigating phone calls made to Good, the authorities located Bower, who had responded to Good's advertisement. In response to questioning by the FBI, Bower denied having met Good or Tate and denied purchasing the ultralight airplane. After a search of Bower's home uncovered pieces of Tate's ultralight, Bower was arrested.

Bower hired Jerry Buckner as counsel. Buckner's neighbor was Lee Werford, Bower's father-in-law, and Werford suggested that Bower retain Buckner as counsel. Buckner had over fifteen years of trial experience, including ten as a prosecutor, and was board certified in criminal law. Buckner's experience included defending and prosecuting a number of murder cases, but he had never previously defended a capital murder defendant. Buckner was assisted by his wife, Brandy, who had experience as a probation officer. Buckner also utilized Shari Bower, Bower's wife, to aid with the case.[1]

In view of the evidence against Bower, Buckner decided to implement a "time/proximity" defense because the state could not place Bower at the ultralight hangar when the ultralight airplane was moved, nor could they prove that Bower had stolen the plane rather than receiving it from a third party or buying it. Buckner described his defense thus: "It's not the same to say he wasn't ever in Grayson County. It's not the same as what I did say. I said, 'you can't put him there.'. . . You can't put him in Grayson County on the time and date the murders occurred."

---

[1]Buckner presented Shari Bower to the trial court as his "investigator." Although he later admitted she did not play an investigative role, Buckner said that he classified her as such so that she could sit at counsel table during trial, where she would be able to talk to her husband and assist Buckner. Buckner also hired Dr. Sanford Frank, a psychologist, twelve days before the trial as an "investigator/psychologist." Dr. Frank did not conduct any investigative work but assisted Buckner with jury selection and testified at a pre-trial bond hearing that he saw no evidence that Bower would commit future violent acts.

2

As a part of his "time/proximity" defense, Buckner focused on what he claimed was the state's illegal search of Bower's garage. Buckner filed a motion to suppress the evidence obtained from the search, which included pieces of the ultralight airplane and what the state argued were traces of blood on a pair of Bower's boots, but the motion was denied. As Buckner saw it, this motion was a vital part of the time/proximity defense because it would have suppressed the only physical evidence the state had that indicated Bower had ever been in Grayson County.

Also as part of his strategy, Buckner advised his client not to testify. Bower wanted to testify that he was in Grayson County on the day of the murders to buy the ultralight but that he left before the murders occurred. Buckner pointed out to him that this story was inconsistent with the many stories he told investigators and with the state's physical evidence, as well as with Buckner's trial strategy of forcing the state to prove Bower's presence in Grayson County, which Buckner believed they could not do. Bower did not testify at trial.

The trial began on April 11, 1984.[2] On April 28, 1984, Bower was convicted and sentenced to death. Thereafter, the Texas Court of Criminal Appeals affirmed Bower's capital murder conviction and death sentence on direct appeal, and certiorari was denied by the Supreme Court of the United States. *Bower v. State*, 769 S.W.2d 887 (Tex. Crim. App. 1989), *cert. denied*, 492 U.S. 927 (1989). Bower's state habeas application was also denied, and the Supreme Court again declined to issue a writ of certiorari. *Ex parte Bower*, 823 S.W.2d 284 (Tex. Crim. App. 1991), *cert. denied*,

---

[2]The trial was scheduled pursuant to the now defunct Texas Speedy Trial Act. In 1987, the Texas Court of Criminal Appeals held that the Speedy Trial Act, codified in the Texas Code of Criminal Procedure art. 32A.01-02, was unconstitutional for violating the separation of powers doctrine of Article II, Section 1 of the Texas Constitution. *See Meshell v. State*, 739 S.W. 2d 246, 257 (Tex. Crim. App. 1987). Buckner stated that it was his strategy to force the state to comply with the Speedy Trial Act and get the case to trial as quickly as possible.

3

506 U.S. 835 (1992).

Bower initiated federal habeas proceedings in the district court on April 14, 1992. The district court conducted a five-day evidentiary hearing between June 12 and 16, 2000. Two years later, the court issued an unpublished, seventy-one page memorandum opinion denying Bower's petition for habeas relief. The district court granted Bower a COA on his ineffective assistance of counsel and cumulative *Brady* claims. Bower sought COAs on the remaining claims in his writ petition, which this court denied. *Bower v. Dretke*, 145 F. App'x 879 (5th Cir. 2005).

In the instant appeal, Bower argues that Buckner's performances at the guilt/innocence phase and the punishment phase of his trial were unreasonably deficient. He also argues that the state failed to turn over material, exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

## II. STANDARD OF REVIEW

Bower filed his appeal on April 14, 1992, prior to the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"); accordingly, pre-AEDPA standards apply in this case. *Slack v. McDaniel*, 529 U.S. 473, 481-82 (2000). Under pre-AEDPA standards, whether counsel was deficient and whether any deficiency prejudiced the petitioner are legal conclusions and are, therefore, reviewed de novo. *Moore v. Johnson*, 194 F.3d 586, 603-04 (5th Cir. 1999). "Claims that the government violated *Brady* are mixed questions of law and fact that we review de novo." *United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006). Because the state habeas judge did not preside over the trial or conduct an evidentiary hearing, the state habeas court's factual findings are not entitled to a presumption of correctness. *See Perillo v. Johnson*, 79 F.3d 441, 445-46 (5th Cir. 1996).

Here, however, the federal district court held its own evidentiary hearing. It was an extensive hearing with both sides presenting numerous witnesses and several exhibits. The factual findings,

4

including credibility determinations, made by the district court from that hearing are reviewed under the clearly erroneous standard. *See, e.g.*, *Strickland v. Washington*, 466 U.S. 668, 698 (1984); *Martinez v. Johnson*, 255 F.3d 229, 237 (5th Cir. 2001).

## III. DISCUSSION

A. Ineffective Assistance of Counsel at the Guilt/Innocence Phase

A defendant's Sixth Amendment rights are violated if counsel's assistance was deficient and the defendant was therefore prejudiced. *Strickland*, 466 U.S. at 687. There are two prongs to the test: (1) whether counsel's representation fell below the objective standard of reasonableness; and (2) whether there is a reasonable probability that, if counsel had not acted unprofessionally, the outcome of the proceeding would have been different. *Id*. at 694. The petitioner must show irresponsibility on the attorney's part that is sufficient to undermine confidence in the outcome of the trial. *Soffar v. Dretke*, 368 F.3d 441, 478 (5th Cir. 2004).

Bower argues that his counsel was deficient during the guilt/innocence phase under two broad categories: (1) Buckner's adoption of the time/proximity defense was unreasonably deficient; and (2) Buckner's performance at the suppression hearing was unreasonably deficient. As to the time/proximity defense, Bower faults Buckner because he (1) failed to investigate adequately the facts surrounding the charges against petitioner and to prepare adequately for trial; (2) failed to understand and apply relevant law; and (3) prevented Bower from taking the stand in his own defense. The district court's multi-day evidentiary hearing encompassed all these issues; thus, our appellate review necessarily entails a detailed review of the record developed below.

1. Failure to Investigate and Prepare for Trial

An attorney has a duty to independently investigate the charges against his client. *Wiggins v.*

5

*Smith*, 539 U.S. 510, 524 (2003). Under this court's jurisprudence, there must be a "reasonable amount" of pretrial investigation. *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir.1994). *Strickland* explains that if an investigation is incomplete, a court should weigh that incompleteness only to the extent that "reasonable professional judgments support the limitations on the investigation" because "counsel has a duty to make . . . a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690-91.

While counsel's selection of a strategy is unchallengeable, *see Strickland*, 466 U.S. at 691, the Sixth, Seventh, and Ninth Circuits have held that the selection of a defense strategy before a "reasonable" investigation is ineffective. *Richey v. Mitchell*, 395 F.3d 660, 685 (6th Cir. 2005), *rev'd on other grounds*, *Bradshaw v. Richey*, 546 U.S. 74 (2005); *White v. Godinez*, 301 F.3d 796, 801, 803 (7th Cir. 2002); *Rios v. Rocha*, 299 F.3d 796, 805-07 (9th Cir. 2002). Although this court has yet to consider to what extent counsel must investigate before selecting a trial strategy, we have held that "[i]nformed evaluation of potential defenses to criminal charges and meaningful discussion with one's client of the realities of his case are cornerstones of effective assistance of counsel." *Washington v. Watkins*, 655 F.2d 1346, 1355 (5th Cir. 1981) (citing *Gaines v. Hopper*, 575 F.2d 1147, 1149-50 (5th Cir. 1978)).

Generally, Bower asserts that the "time/proximity" defense was unreasonable and that a more reasonable defense would have acknowledged Bower's presence at the ultralight hangar when he purchased the ultralight prior to the murders. Bower points to several specific deficiencies on Buckner's part: Buckner made only one trip to the murder scene; Buckner formulated his defense strategy before conducting his investigation; Buckner visited his client only three times before trial; Buckner billed only eighty-six hours for time spent on the case; Buckner ignored alternate theories

6

of the crime and failed to hire an independent investigator; Buckner failed to retain local counsel; Buckner failed to ask for a needed continuance; Buckner failed to call a ballistics expert, an ultralight expert, and a serology expert to counter the state's expert testimony; and finally, Buckner failed to prepare for closing arguments.

a. Early Formulation of Trial Strategy

Bower's claims do not facially demonstrate that Buckner failed to conduct a reasonable investigation. Neither Buckner's early formulation of a defense strategy nor his failure to call experts conclusively demonstrates that there was no investigation. An early formulation of trial strategy and a decision to attack the state's expert witnesses on cross examination rather than calling additional experts can be a part of a reasonable trial strategy. *See Strickland*, 466 U.S. at 691.

When analyzed under our case law, the record does not support the conclusion that Buckner failed to conduct a constitutionally sufficient investigation in preparation for trial. Based on the evidentiary record before it, the district court made specific findings that Buckner visited the scene of the crime, interviewed state and federal investigators, and interviewed or elicited statements from all of the state's witnesses. When Buckner received police investigative reports, he directed his wife, an experienced parole officer, to screen and collate the documents. Buckner testified that he followed every tip he received concerning alternate theories. For example, after hearing of a person named "Runnels" who had information regarding other possible perpetrators, Buckner contacted him, through intermediaries, and determined that his testimony was unhelpful. Buckner also testified that he interviewed an ultralight dealer before the trial and he reviewed the state's investigative file.

Buckner gave further testimony at the evidentiary hearing that he considered all the evidence against Bower before developing a strategy. The evidence initially given to Buckner was pieces of

7

an ultralight airplane found in Bower's garage and telephone records showing that Bower had telephone contact with one of the deceased. Buckner also testified that after being retained, he received copies of the state's investigative work. Buckner stated that although his working theory was time/proximity, he only pursued this defense after meeting with Bower and considering all of the state's evidence. Buckner also implied, contrary to Bower's assertions that Buckner reviewed the state's evidence only a few weeks before trial, that he had considered some of the state's evidence even before meeting with Bower: "In this case I already had the lab reports and the officer's testimony. . . . It was inconsistent with [Bower's] story."

Buckner's actions are not comparable to the insufficient investigations found to be ineffective in our sister circuits. In *White*, the attorney completely failed to investigate the defendant's alibi and failed to interview potential witnesses. *White*, 301 F.3d at 801. In *Rios*, the attorney formulated an "unconsciousness" defense strategy after interviewing a single witness who was underage and had admitted that she was drinking on the night of the crime. Additionally, the attorney made that decision despite reading statements in police reports from other witnesses, whom he did not interview, stating that his client *did not* commit the crime. *Rios*, 299 F.3d at 805-07. Here, according to his testimony, which the district court found credible, Buckner did weigh the evidence before formulating his strategy. The trial record also supports the conclusion that Buckner interviewed all the relevant witnesses[3] as well as investigated potential leads and attempted to place this information before the jury through vigorous cross-examination. Furthermore, Buckner's performance at trial, in particular his cross examination of the state's expert witnesses, *see* subsection f *supra*, rebuts Bower's argument

---

[3]The lack of investigation in a recent Fifth Circuit case, *Harrison v. Quarterman*, — F.3d —, 2007 WL 2306918 (5th Cir. 2007), including the complete failure to interview essential defense witnesses, is in stark contrast to the investigation that Buckner undertook in this case.

that Buckner failed to conduct an investigation or prepare for trial.

In particular, Buckner's deft handling of Sheriff Driscoll at trial demonstrates that he both understood the state's strategy in prosecuting the case and formulated a reasonable strategy of his own to counter it. Buckner called the Sheriff to the stand during his own case presentation. Ronald Sievert, one of the prosecutors at Bower's trial, testified that Buckner's calling the Sheriff "raised a lot of problems because Sheriff Driscoll talked about all the wild theories that came out, and there was a potential of confusing the jury from the government's side." This decision shows definite strategic preparation on Buckner's part because he knew that the government hoped to suppress all their previous theories precisely because these theories would distract from the circumstantial case they had against Bower. The district court found Buckner's testimony regarding his preparation credible, and after our own independent review of the record, we find no clear error in the district court's determination.

### b. Client Visits and Time Keeping

Bower also points to the fact that Buckner only visited him three times in jail as evidence of insufficient preparation. Buckner testified at the evidentiary hearing that he talked with Bower "all the time" during jury selection. During these times, Buckner testified that they would discuss and "swap out" information regarding recent developments. Following each day of the trial, he spoke with Bower, his wife, family, and friends and elicited their suggestions and observations, although Bower's family members testified that Buckner usually drank and seemed more concerned with socializing by the pool at the end of the day. The district court, however, found Buckner credible on this point as well, and we find no clear error in its factual finding.

Bower argues that Buckner did not spend an adequate amount of time preparing for trial.

9

Time sheets indicate that Buckner worked eighty-six hours on Bower's case between January 20, 1984, and April 10, 1984. For the entire representation, including trial, Buckner billed Bower's family for 407 hours, of which 75.25 hours were billed for Buckner's wife's services and approximately150 hours were billed for time spent at the trial. Furthermore, according to Bower, Buckner worked on numerous civil matters, tried two civil cases, and appeared regularly in court on thirteen criminal matters in the weeks before Bower's trial. Buckner testified that he spent more time on Bower's case than the 407 hours he billed and that the other cases he tried were minor and required little time. We decline to find ineffective assistance based on the time sheets alone, *see United States v. Raineri*, 42 F.3d 36, 44 (1st Cir. 1994), and it was not clear error for the district court to find that Buckner adequately prepared for the trial, given the obvious effort that Buckner put into his trial preparations, as detailed below.

### c. Independent Investigator

Bower argues that an independent investigator would have uncovered evidence that some of the victims were involved in gambling and trafficking illegal drugs. He believes that more investigation would have proven that the victims were actually killed during a drug deal gone wrong. Additionally, Bower points to affidavits before the district court of potential witnesses willing to testify to the identities of other suspects. Buckner testified at the evidentiary hearing that he followed up on these rumors but found no one at the time willing to make a statement. He also testified that, as the police found no plausible evidence of other suspects, he did not wish to place the additional expense on the Bower family of hiring an investigator when there appeared to be no justification for doing so.

Although Buckner did not hire an independent investigator, this fact alone is not indicative

10

of ineffective assistance in a capital case. The decision to hire an investigator is reviewed for reasonableness. *See Strickland*, 466 U.S. at 691. In *Bryant*, we held that an attorney's failure to investigate was unreasonable under *Strickland* when that attorney failed to interview known eye witnesses to the crime and limited his trial investigation to discussions with the defendant and examination of the prosecutor's file. *See Bryant*, 28 F.3d at 1418. Here, there were no eyewitnesses that Buckner failed to interview, either witnesses to the murders themselves or credible witnesses willing to testify regarding other potential perpetrators. Because of the nature of the unverified rumors as well as the paucity of witnesses willing to confirm them at the time of the trial, Buckner's decision not to hire an investigator was not objectively unreasonable, and his investigation provided him a reasonable basis on which to make the decision of whether or not to hire an investigator.

d. Local Counsel

Buckner's decision not to hire local counsel was not deficient. Buckner resided in Weatherford, TX, over 100 miles from where the trial was conducted in Sherman, TX. Because Buckner stayed in Sherman during the trial, Bower argues that Buckner should have hired local counsel to help him organize files and to provide logistical support. In the evidentiary hearing, Buckner testified that the hiring of local counsel "was an option with [Bower and his family] if they thought that was something they wanted to spend some more money on." Additionally, Buckner testified that he did not need to hire local counsel because he had an adequate office set-up at home, as well as in his hotel suite. We find no deficiency in this decision.

e. Motion for Continuance Prior to Trial

Bower argues that Buckner should have asked for a continuance prior to trial in order to review and synthesize the large amount of evidence in this trial. Only seven months elapsed between

11

the crime and the beginning of the trial. Bower believes that Buckner's failure to ask for a continuance was unreasonable because Buckner did not have enough time to prepare, as Buckner stated before the trial court "[w]e've been furnished with thousands of pages of reports and there are hundreds of witnesses. And it's a very complicated case – would be a gross understatement." As discussed above and below, we find no deficiency in Buckner's preparation for trial. Additionally, we conclude from the record that taking the case to trial quickly was a strategic decision on Buckner's part. Because he employed a time/proximity defense and because the state had no physical evidence that could place Bower in Grayson County on the day of the murders, Buckner believed that taking the case to trial as quickly as possible was essential in order to rush the state in its preparation of the case and limit the amount of circumstantial evidence it could marshal. This court will not question a counsel's reasonable strategic decisions. *See Strickland*, 466 U.S. at 691 (An attorney's strategic choices "are virtually unchallengeable.").

### f. Expert Witnesses

Bower also raises multiple claims about ineffectiveness based on Buckner's failure to call expert witnesses to rebut the state's experts. Buckner testified that he did not call his own ballistics expert because he felt the state's ballistics evidence was weak and he planned to bring out those weaknesses on cross-examination. This strategy is reflected in Buckner's vigorous cross-examination of Paul Schrecker, the FBI ballistics expert, and Larry Fletcher, ballistics expert from the Dallas Police Department. During both cross-examinations, Buckner displayed a working and competent knowledge of the state's ballistics evidence as well as the rumors concerning alternate theories of the

crime,[4] which demonstrates that he had investigated and prepared for trial.[5] Although Buckner did

not hire his own ballistics expert, he conducted a vigorous cross examination of the state's expert.

*See Dees v. Caspiri*, 904 F.2d 452, 455 (8th Cir. 1990) ("Counsel had a duty to garner the expertise

necessary to cross examine [the state's expert].").

In *Richey*, the attorney failed to "screen, supervise, or engage" his own expert witness to the

extent that his witness ultimately ended up testifying for the government. The attorney also neglected

to find another expert to contradict the state's testimony. The Sixth Circuit found this important

because in that case expert testimony was a major component of the case and there was "substantial

contradiction" in the relevant area of expertise. *Richey*, 395 F.3d at 685 (quoting *Knott v. Mabry*, 671

---

[4]In his cross examination of Schrecker, Buckner asks "In your experience working with ballistics, have you found the smaller calibers to be used more by organized crime or some sophisticated execution type, or do they generally tend to use the large caliber?" This questioning demonstrates that Buckner was aware of the alternate theories of the crime and attempted to place those theories before the jury.

[5]For example, Buckner engaged Schrecker in the following colloquy about the technical intricacies of the .22 caliber ammunition in order to rebut Shrecker's conclusions about the type of weapon and ammunition used:
Question: A 223 is a .22 caliber?
Answer: Yes, it is.
Question: I will just name a few and if I'm wrong, let me know. A 222, .22 Horney, 225, 224, are those all .22 caliber weapons?
Answer: Those are all approximately .22 caliber, yes.
Question: And those are all center fire? Most of them – I think all of them?
Answer: I think the ones you just named are all center fire, yes, sir.
Question: And in rim fire you have got; .22 short, .22 long, .22 long rifle, and .22 rim fire magnums?
Answer: Yes.
Question: Is there any others?
Answer: There might be. You may have missed some, but that's essentially most of them.

This exchange supports the district court's factual finding that Buckner did significant preparation for trial, including research on technical issues presented by the state's expert witnesses in order to refute their testimony.

F.2d 1208, 1213 (8th Cir. 1982)). Bower argues that the "substantial contradiction" in this case requiring a ballistics expert was that Bower's Ruger .22[6] contained a round firing pin, eliminating it as the murder weapon. Bower's argument relies on ballistics tests conducted by Fletcher and an affidavit from a Ruger firearms representative.

During the initial murder investigation, Fletcher conducted ballistics tests analyzing bullet fragments removed from the bodies of all four victims. In a conversation with Sheriff Driscoll, which Driscoll summarized in a written report, Fletcher eliminated the Ruger pistol belonging to one of the victims, Bobby Tate, as the murder weapon, concluding that it didn't "have the right firing pin for a match on the casings." Fletcher also stated, according to Driscoll's notes, that the murder weapon was an older model than Tate's, was manufactured "prior to the advent of a locking slide mechanism" because it held eleven rounds, and "should have a square rectangular firing pin." Tate's .22 Ruger pistol was shipped in 1976, and Bower's .22 Ruger pistol was shipped in 1981. The affidavit of the Ruger firearms representative, submitted by Bower, concludes that "the internal mechanisms of [Tate's and Bower's Ruger pistols], including their firing pins, are substantially identical."

Buckner was well aware of the issues concerning the state's ballistics evidence. In some of the notes that Shari Bower periodically gave to Buckner, Shari Bower summarizes Fletcher's report and writes that the information is important "because [Bower's] gun was probably not an older model." During his cross-examination of Fletcher, Buckner highlighted these exact issues with regard to the state's ballistics evidence. Upon persistent questioning by Buckner and despite Driscoll's written notes, Fletcher denied telling Driscoll that the Ruger pistol involved was older than Tate's

[6]During trial, the state presented evidence that Bower owned a Ruger .22 pistol similar to the kind used in the killings, a weapon that Bower claimed he buried while camping in the Colorado mountains.

model or that the murder weapon held eleven rounds. Fletcher would only state that he "may have" told Driscoll that the type of Ruger pistol involved was an older model but that he could only definitively conclude that the weapon was semi-automatic and either a Ruger or High Standard brand.

There was never any physical ballistics evidence presented that the murder weapon was an older model; thus, there would have been little, in terms of the state's ballistic evidence, for Bower's expert to rebut. Therefore, unlike *Richey*, there was no "substantial contradiction" in the state's ballistic evidence that could have been made plain by another expert. The state presented only circumstantial ballistics evidence, and Buckner did not believe it to be damaging. It was well within Buckner's strategic discretion not to look for another expert. *Dees*, 904 F.2d at 454-55. Unless a crucial and important legal issue rests on the reliability of scientific evidence, as in *Richey*, counsel is not constitutionally required to seek out a contradictory expert so long as the decision not to call an expert is informed and based on a strategic decision. Considering the other circumstantial evidence linking Bower to the crime, and in light of Buckner's vigorous cross-examination of the state's ballistics expert, Buckner's decision not to seek out a contradictory expert for this purpose was not constitutionally ineffective.

Buckner also elicited damaging testimony from Lori Grennan, the state's expert on ultralight aircraft. Bower argues that Buckner should have called his own expert on ultralight aircraft in order to counter the state's theory. At trial, the state proposed that the ripped wing debris found at the ultralight hangar suggested that the ultralight was ripped from its moorings as it was hurriedly stolen after the murders. Bower believes that if Buckner had investigated more thoroughly, he would have discovered by consulting his own expert that this debris resulted from normal ultralight maintenance rather than a rushed theft. However, Buckner did in fact consult an ultralight dealer to confirm the

state's evidence on ultralight planes, and the record contains no evidence that the ultralight dealer gave Buckner reason to conduct further investigation into the appropriate inference to be drawn from the ultralight debris found in the hangar. Unless given a reason to conduct further investigation, we find that reasonable counsel would have no reason to suspect that an expert on ultralight maintenance would have contradicted the state expert's inference of a robbery.

Buckner's failure to call experts to counter the state's other evidence also was not ineffective. In his cross examination of Bill Eubanks, the state's forensics expert, Buckner got Eubanks to concede that a possible reason why they couldn't positively type the blood found in Bower's garage was because it was extremely old. Although Buckner did not cross-examine the state's metallurgy expert, Bill Tobin, he had a strategic basis for that decision. Buckner testified that he did not cross examine Tobin because his credentials were unassailable and because Tobin's testimony did not hurt his time/proximity defense. Buckner's strategic decisions regarding expert witnesses were not deficient.

### g. Closing Arguments

Bower also points to Buckner's notes or lack thereof for his closing arguments. Our review of the trial record indicates that Buckner gave an extended argument to the jury; his lack of notes does not necessarily mean that his representation was defective. During his argument, he contradicted all of the state's circumstantial evidence, including the blood and ballistics evidence. He argued the same time/proximity defense during his closing argument that he consistently suggested through his questioning at trial. Buckner's performance during his closing argument was not deficient. Taking all the evidence together, the record does not indicate that Buckner failed to investigate or prepare for trial, and we find that his performance was not deficient on this count.

16

2. Failure to Understand and Apply Relevant Law

Bower argues that Buckner failed to understand and apply the relevant case law. He points to Buckner's performance during a critical suppression hearing for support. In his motion to suppress, Buckner failed to cite any cases. Bower is not eligible for habeas relief on the Fourth Amendment claim, *see Stone v. Powell*, 428 U.S. 465 (1976), although Buckner's performance in litigating this issue can be used to support a claim that his representation was ineffective. Buckner testified that he felt citing cases was unnecessary because of the trial judge's experience in dealing with Fourth Amendment issues. At the suppression hearing, however, Buckner asked the trial judge to consider specific sections of the Texas Constitution. Additionally, Buckner vigorously questioned both witnesses at the hearing. While Buckner's decision not to cite cases in his motion to suppress may qualify as a questionable strategic choice, in light of his performance at the suppression hearing and the latitude this court gives to strategic decisions, we cannot conclude that his overall representation of Bower was constitutionally ineffective.

3. Failure to Allow or Advise Bower to Testify

Bower asserts that his counsel prevented him from testifying at trial. The right to testify is a fundamental right, *Rock v. Arkansas*, 483 U.S. 44, 50, 52 (1997), that is personal to the defendant; therefore, only the defendant can waive that right, voluntarily and knowingly. *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir.1997). "A defendant who argues that his attorney prevented him from testifying must still satisfy the two prongs of *Strickland*." *United States v. Harris*, 408 F.3d 186, 192 (5th Cir. 2005). This court has repeatedly held there is "a strong presumption that counsel's decision not to place [a defendant] on the stand was sound trial strategy." *Sayre v. Anderson*, 238 F.3d 631, 635 (5th Cir. 2001). Nonetheless, counsel cannot override the ultimate decision of a defendant who

17

wishes to testify contrary to counsel's advice. *United States v. Mullins*, 315 F.3d 449, 453 (5th Cir. 2002).

Bower argues that he never waived his right to testify on or off the record. In fact, Bower and his wife, who sat with her husband at the counsel table throughout the trial, testified that Buckner rested his defense without ever asking Bower if he wished to testify. Bower states that because of the weight of the evidence, he felt during trial that he had to testify; therefore, he was shocked that Buckner rested after only two hours without consulting Bower about his right to testify. Buckner testified that during a pre-trial visit with his client, he spoke to Bower about the evidence and about viable trial strategy, and that during this conversation, Bower himself made the decision not to testify. Buckner stated, in response to questioning by the court, that he did not confirm this decision with Bower during the trial but assumed that Bower's original decision not to testify was still valid. Buckner also testified that he was positive Bower "knew he had a right to testify and it was his decision as to whether to testify . . . ." Having heard from Bower and his wife, Shari, and Buckner, the district court found Buckner's testimony credible.

The district court, in its memorandum opinion, focused on the fact that Buckner did not force Bower not to testify. As Bower states, this is not the proper inquiry. Instead, the district court should have focused on whether or not Bower made a knowing waiver of his right to testify. *Emery*, 139 F.3d at 198. After reviewing the record and recognizing that the district court found Buckner's testimony credible, we find that Bower knowingly waived his right to testify and did not communicate any change of heart during trial to his counsel. Thus, we find no violation.

Bower also contends, that even if he did waive his right to testify, it was ineffective for Bower to encourage him not to testify. Generally, Bower asserts that the "time/proximity" defense was

18

unreasonable and that a more reasonable defense would have been to allow Bower to testify and acknowledge that he visited the ultralight hangar before the murders to purchase the ultralight. Specifically, Bower argues that during the initial investigation of the crime scene a business card was found on one of the victims. He also alleges that one of the victims' wives asked police investigators whether $3000 was found on her husband's body. Bower claims that the business card was his, given to the victim when he bought the plane, and the $3000 was a down payment that he made on the plane. While the business card is mentioned in the state's investigative reports, it was lost at some point during the investigation and has never been found. According to Bower, the lost business card and the possible presence of $3000 are strong evidence of his preferred theory.

We do not agree that Buckner's strategy, including his advice that Bower not testify, was unreasonable. If Bower had testified, he would have been subject to cross-examination concerning, inter alia, his numerous inconsistent and untrue statements to the FBI; where he got the money to buy the ultralight; why he told other people that he was assembling his own ultralight from parts in his garage; and why he had disassembled the ultralight and hidden pieces of it in his garage and in a field. Neither the business card nor the $3000 would be sufficient to explain these many inconsistencies and gaps in Bower's story. Moreover, as Buckner noted, by testifying that he was at the ranch on the day of the murders and had met with the victims, Bower would have established the time/proximity element of the state's case without gaining any benefit for his alternate theory that someone else committed the murders. Buckner's advice on testifying and his time/proximity strategy were not unreasonable, and we decline to find deficiency.

B. Ineffective Assistance of Counsel at the Punishment Phase[7]

1. Failure to Present Mitigation Evidence

Bower argues that Buckner was ineffective because he entered into a "deal" with the prosecution to limit the number of mitigation witnesses during the punishment phase. At the punishment phase, Buckner called Denise Bower, Bower's sister, Cheryl Smiley, Bower's sister, Jo Werford, Bower's mother-in-law, Wilma Bower, Bower's mother, Kelly Hamilton, Bower's sister-in-law, and Lorene Hallifax, Bower's friend, as character witnesses. During the evidentiary hearing before the district court, several of Buckner's relatives and friends testified that they would have provided character evidence for Bower if Buckner had called them to the stand.

In *Williams v. Taylor*, 529 U.S. 362, 396 (2000), the Supreme Court held that an attorney's decision not to present additional mitigating evidence was ineffective where such evidence was "voluminous" and "graphically" described the defendant's "nightmarish" childhood. In this case, there was no additional mitigating evidence that Buckner failed to present. Bower argued before the district court that there were specific potential character witnesses, notably Robert Triplett, a childhood friend, Gary Dawson, a high school friend, and Mike Smiley, Bower's brother-in-law, that Buckner failed to call to the stand in the penalty phase. However, the testimony that Bower posits that these witnesses could have presented, such as his commitment to truthfulness as a child, the fact that he was a Boy Scout, and his resourcefulness, do not materially add to the evidence of good character that Buckner put before the jury. Buckner's strategic decision not to call additional

---

[7]In an order issued on June 13, 2002, denying Bower's motion to amend, the district court found that Buckner was deficient in one instance: by not mentioning the evidence of good character he elicited during the penalty phase in his closing argument. The district court did not grant relief on this ground because it did not find prejudice. However, this issue was not raised in this appeal, and we do not consider it.

20

character witnesses was not ineffective where Bower cannot demonstrate that additional witnesses would have given testimony materially differing in substance from the multiple witnesses Buckner called to the stand.

Specifically, Bower points to Buckner's decision not to call Dr. Sanford Frank, a psychologist who testified at an earlier bond hearing, to testify concerning Bower's propensity for future violence during the punishment phase. Although Bower argued below that Buckner failed to call additional witnesses during the punishment phase, Bower never argued that Buckner was deficient for failing to call Dr. Frank to present expert testimony during this hearing, and the district court heard no testimony on this issue. We will not consider issues raised for the first time on appeal, *United States v. Scott*, 672 F.2d 454, 455 (5th Cir. 1982), and this argument is waived. Additionally, the argument is also likely meritless. Dr. Frank would have been subject to cross-examination about the psychological tests he administered to Bower that indicated to him that Bower was being untruthful. Furthermore, calling Dr. Frank may have invited negative psychiatric testimony from the state on the issue of future dangerousness. Even if the issue were not waived, it is likely that Buckner's performance was not deficient.

### 2. Failure to Prepare Witnesses

Bower alleges that Buckner did not adequately prepare witnesses for the punishment phase and did not speak to some witnesses at all. Buckner testified at the evidentiary hearing that he began preparing for the punishment phase before jury selection by developing a list of witnesses and researching background information about Bower. Buckner testified that he focused on specific instances from Bower's background "where he had been a hero and done really great things for people," giving "specific instances of really outstanding human kindness" and "thoughtful behavior."

21

Additionally, Buckner testified that he did not "put anybody on the stand without talking to them or knowing what they were going to say." Based on this testimony, which the district court found credible, Buckner did in fact prepare witnesses for the punishment phase.

Bower argues that Buckner's questioning of Jo Werford, Bower's mother-in-law, demonstrates that Buckner did not prepare for the punishment phase. Jo Werford admitted under cross-examination by the state that a gun[8] she had reported missing from her home was later found at Bower's home. Bower argues that Buckner would not have called Jo Werford if he had adequately prepared for the punishment phase because he would have known she would give damaging testimony. *See Fisher v. Gibson*, 282 F.3d 1283, 1296 (10th Cir. 2002) ("Where an attorney accidentally brings out testimony that is damaging because he has failed to prepare, his conduct cannot be called a strategic choice . . . ."). However, Buckner spoke to each mitigation witness before he or she testified. Accordingly, Bower's reliance on *Fisher* is misplaced because that case faulted counsel's performance where counsel had no strategy and had undertaken no preparation. *Id.* Because Buckner conducted a reasonable investigation in preparation for the penalty phase, we affirm and find no deficiency.

C. *Brady* Claim

The prosecution has a duty to disclose exculpatory evidence that is material to either guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Materiality requires "an exculpatory value that was apparent before the evidence was destroyed" and that was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Cali. v. Trombetta*, 467 U.S. 479, 489 (1984). Moreover, "evidence is material only if there is a reasonable

---

[8]The gun at issue was not the murder weapon.

22

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Absent a showing of bad faith, failure to preserve potentially useful evidence does not constitute a denial of due process. *Ariz. v. Youngblood*, 488 U.S. 51, 57-58 (1988). In sum, impermissibly withheld evidence must be either (1) material and exculpatory or (2) only potentially useful, in combination with a showing of bad faith on the part of the government. *Ill. v. Fisher*, 540 U.S. 544 (2004).

Bower alleges that the state failed to produce exculpatory and impeachment evidence from federal investigative files indicating that: (1) Tate was involved in illegal gambling and drug dealing and was killed because he had used proceeds from drug sales to pay off gambling debts instead of repaying his drug source; (2) in 1983, Fiocchi .22 caliber long rifle subsonic ammunition was readily available at gun shows throughout Texas, including shows in Dallas in November 1983; (3) subsonic ammunition had benign uses including indoor shooting, teaching someone to shoot who did not like loud noises, and getting rid of vermin in populated areas; and (4) Catawba tubes adapted for use as silencers on Ruger pistols were readily available from many sources.

In our decisions discussing the *Brady* standard, we have held that "[t]he materiality of *Brady* evidence depends almost entirely on the value of the evidence relative to the other evidence mustered by the State." *Smith v. Black*, 904 F.2d 950, 967 (5th Cir. 1990); *see also Allridge v. Scott*, 41 F.3d 213, 218 (5th Cir. 1994) (holding that when the undisclosed evidence is merely cumulative of other evidence, no *Brady* violation occurs).

None of the evidence argued to support Bower's *Brady* claim, in the form of over 2,000 pages of FBI files, is exculpatory; that is, none of the evidence is sufficient to "undermine confidence

in the jury's verdict." *See Spence v. Johnson*, 80 F.3d 989, 999 (5th Cir. 1996). The FBI documents do not provide any evidence linking the murders to the victims' alleged illegal activity. The documents simply summarize investigative theories that the FBI was pursuing, theories that Bower's counsel acknowledged he was aware of but didn't extensively pursue himself. The files state that the "initial information developed indicated" that the murders may have been related to illegal activity but that "further investigation" identified Bower. None of the evidence relating to illegal activity undercuts the state's evidence regarding Bower.

The evidence in the FBI files concerning the availability of Fiocchi ammunition is also not material because the information does not contradict the state's expert testimony. Although the files contain information regarding numerous individuals who had purchased Fiocchi ammunition for various purposes, they do not directly contradict the state's evidence that the ammunition was not widely available.

When reviewing a *Brady* claim, the determination of the materiality of withheld evidence must be made "collectively, not item-by-item." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Having reviewed the evidence cumulatively, we hold that it was not material. Although providing some support for an alternative theory of the crime, a theory which Bower's counsel was well aware of, none of the FBI files contradict the circumstantial evidence used by the state to convict Bower.

D. Motion for Reconsideration

On May 31, 2007, Bower filed a motion for reconsideration of this court's judgment denying a COA on his *Penry* claims. We deny the motion.

IV. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of habeas relief. Further, we

24

deny the petitioner's motion for reconsideration.