IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 9, 2008

Charles R. Fulbruge III
Clerk

No. 06-20270

BRIAN MEGAS

Petitioner - Appellant

v.

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent - Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:04-CV-4749

Before GARWOOD, CLEMENT and ELROD, Circuit Judges.

PER CURIAM:[*]

Brian Megas, who is currently incarcerated in the Texas Department of
Criminal Justice, Correctional Institutions Division, appeals the district court's
denial of his petition for writ of habeas corpus under 28 U.S.C. § 2254. He
argues that his conviction and sentence for the felony murder of Pauline Tanner
violates the Constitution because the State withheld material, exculpatory
evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963).

---

[*] Pursuant to 5TH CIR. R. 47.5, this court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

# I. FACTS AND PROCEEDINGS

## A. Facts

The facts, as set forth by the First Court of Appeals of Texas in its opinion affirming Megas's conviction, are as follows:

[Megas] and Pauline Tanner were dating. On July 23, 1999, [Megas] drove Tanner to a bar in Houston where they met some of [Megas's] co-workers. [Megas] and Tanner became intoxicated and began arguing. [Megas] attempted to leave the bar around midnight, but both Tanner and an acquaintance of [Megas] asked him not to leave. [Megas] agreed to have Tanner drive them both to her house, where her brother, Nicholas, was waiting for a ride to [Megas's] house.

On arriving at Tanner's house, she got out of the car and [Megas] moved to the driver's side. [Megas] and Tanner continued to argue, while Nicholas got into the passenger seat of the car and Tanner got into the back seat. [Megas] yelled profanities at Tanner and told Nicholas that, if he did not like it, he could get out of the car. Nicholas got out of the car. [Megas] and Tanner left, heading northbound on Highway 59.

At some point, [Megas] and Tanner pulled over to the left-hand side of the highway. Leolanna Pruitt was a passenger in a vehicle traveling southbound on the highway, and observed appellant punch and kick Tanner to keep her from getting out of the car. Linda Tyler was traveling northbound on the highway and observed Tanner running away from the car toward the barricade while [Megas] was holding onto her with one hand and punching her with the other. Tyler pulled over to render aid and began honking her horn. [Megas] then stopped hitting Tanner, dragged her into the car, and drove off.

A short time later, [Megas] swerved into the right barricade. Two more witnesses observed [Megas] strike the barricade twice and flip the car several times until it landed on its roof. Tanner was partially ejected from the car and killed when the car rolled on top of her.

The medical examiner determined that the cause of death was asphyxia, due to compression and dislocation of the neck, and stated the injuries from the accident caused the death. The medical examiner also found bruises on Tanner's arm that were consistent

2

with defensive wounds, and bruises on her legs that were consistent with being kicked repeatedly. [Megas] had a blood alcohol concentration of 0.25 grams of alcohol per 100 milliliters of blood.

Megas v. State, 68 S.W.3d 234, 237–38 (Tex. App. 2002).

B. Proceedings

(1) State trial and direct appeal proceedings

On October 1, 1999, Megas was indicted in the 183rd Judicial District Court of Harris County, Texas for intoxication manslaughter and felony murder in connection with the death of Tanner. The State dismissed the indictment for intoxication manslaughter and tried Megas for felony murder, which was predicated on the theory that Tanner was killed in the course of a kidnapping. Megas pled not guilty.

Before trial, Megas sought discovery of numerous items, including any Brady material. On April 7, 2000, the trial court ordered the State to disclose "all exculpatory evidence pursuant to Brady v. Maryland and related cases." The order provided that "the Defense should exercise reasonable diligence to contact the State's attorney and arrange a mutually convenient time for the appointment." This order also required the parties to comply by April 20, 2000.

Megas's trial began on May 9, 2000. At the conclusion of the evidence, Megas requested and received a jury instruction on the lesser-included-offense of intoxication manslaughter. On May 11, 2000, a jury found Megas guilty of felony murder, and on May 16, 2000, the same jury sentenced him to fourteen years of imprisonment. Megas appealed to the First Court of Appeals of Texas, and it affirmed his conviction on January 31, 2002. The Texas Court of Criminal Appeals ("TCCA") denied Megas's petition for review on July 31, 2003.

(2) State habeas proceedings

Megas retained new counsel for post-conviction habeas proceedings, who submitted an open records request to the prosecutor's office. The office subsequently turned over Megas's file, which included a March 3, 2000 letter

addressed to the prosecutor from Claire Tanner, Tanner's mother and the State's witness. The letter, in relevant part, provided:

> A week before the fatal accident, [Tanner and Megas] had a violent argument, and we were sure [Megas] had hit her, because we could see marks on her arms. She denied it, but was obviously shattered. . . .
>
> During the several months leading up to her death, Pauline began to show signs of destabilization. She was distracted, depressed and quick to anger. . . .
>
> I am not trying to paint a picture of a helpless person here. Pauline was physically strong, a devotee of TaeBo, and intelligent.

On October 21, 2003, following the discovery of this letter, Megas filed a state application for writ of habeas corpus, alleging in part that the State failed to turn over material, exculpatory evidence—the letter—in violation of Brady. In support of this allegation, Megas attached an affidavit by his trial counsel, Clinton Greenwood. Greenwood provided that the State never disclosed the letter and that he never saw the letter in the prosecutor's file. He further asserted that (1) had he been aware of Tanner's denial of the prior assault, he would have cross-examined Claire Tanner differently and halted a damaging line of questioning posed to Megas on cross-examination; (2) had he known of Tanner's emotional instability, he would have been better able to defend against the kidnapping charge by showing that Megas was trying to protect Tanner from running into the street when he restrained her; and (3) had he been informed of Tanner's physical strength, he could have better countered the State's argument that she was weak and could not escape Megas.

The State filed a response, which included an affidavit by the assistant district attorney handling Megas's trial, Mike Trent. Trent admitted that he did not disclose the letter to Greenwood, because he did not believe it contained any material, exculpatory evidence that was not already available to Megas. He also stated that even though he did not disclose it, the letter was kept in the

4

prosecutor's file, which was made available to defense counsel through the prosecutor's open-file policy.

On February 20, 2004, the state trial court entered findings of fact and conclusions of law, recommending that Megas's application be denied. The trial court's conclusion rested on the following findings: the disputed evidence was (1) inadmissible; (2) not exculpatory to the murder charge; (3) could have been obtained by the defense if reasonable diligence had been exercised; and (4) not material because there was no reasonable probability that the outcome of the trial would have been different had the disputed evidence been disclosed to Megas. The TCCA adopted the trial court's findings and denied relief on December 15, 2004.

(3) Federal habeas proceedings

Megas filed a 28 U.S.C. § 2254 petition for post-conviction relief on December 17, 2004, alleging in part that the State withheld the letter in violation of Brady. The district court denied relief on March 14, 2006, finding that: (1) the letter's contents, with respect to Tanner's emotional instability and physical strength, were readily discoverable to Megas; and (2) Tanner's denial that she had been previously assaulted by Megas was not material because Claire Tanner believed that denial was untruthful and the denial did not impact the inculpatory evidence of the kidnapping on the night of her death. On March 20, 2006, Megas appealed. On June 27, 2007, this court granted Megas's request for a certificate of appealability ("COA") on his Brady claim.

II. STANDARD OF REVIEW

Megas's petition is subject to review under the amendments to the federal habeas corpus statutes embodied in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See 28 U.S.C. § 2254; Lindh v. Murphy, 521 U.S. 320, 336 (1997) (holding that AEDPA only applies to those habeas corpus petitions filed after its effective date of April 24, 1996). Accordingly, Megas has

the burden to show that he is entitled to relief under the highly deferential standard of AEDPA. See Woodford v. Visciotti, 537 U.S. 19, 24–25 (2002).

Under AEDPA, a federal petitioner may not obtain habeas corpus relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Courts review pure questions of law and mixed questions of law and fact under subsection (d)(1) and pure questions of fact under subsection (d)(2). See Martin v. Cain, 246 F.3d 471, 475–76 (5th Cir. 2001). "Because a Brady claim involves a mixed question of law and fact, § 2254(d)(1) applies instead of § 2254(d)(2)." DiLosa v. Cain, 279 F.3d 259, 262 n.2 (5th Cir. 2002). Thus, this court does "not decide de novo whether a state prisoner has sufficiently proven a Brady violation"; "[r]ather, we decide whether the state court's Brady determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law." Dickson v. Quarterman, 462 F.3d 470, 477–78 (5th Cir. 2006).

A state-court decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). A state-court decision is an unreasonable application of federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner.

Price v. Vincent, 538 U.S. 634, 641 (2003) (internal quotations and citation omitted); see also Wiggins v. Smith, 539 U.S. 510, 520–21 (2003) (explaining that "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" (citations omitted)).

## III. DISCUSSION

Megas argues that the district court should be reversed because the state-court determination that there was no Brady violation is objectively unreasonable. Megas's argument rests solely on his assertion that the State violated Brady by withholding Claire Tanner's March 3, 2000 letter, which contained the following material, exculpatory information: (1) Tanner denied that Megas hit her on a previous occasion,[1] (2) Tanner was emotionally unstable at the time of her death, and (3) Tanner was physically strong. Megas further alleges that if he had this information before trial, then he would have been able to better defend against the felony murder charge. We disagree.

"The prosecution has a duty to disclose exculpatory evidence that is material to either guilt or punishment." Bower v. Quarterman, 497 F.3d 459, 476 (5th Cir. 2007) (citing Brady, 373 U.S. at 87). To establish a Brady violation, a defendant must show: (1) the evidence was actually suppressed by the State,

---

[1] In this prior altercation, Megas was driving a car, while he and Tanner had a violent argument. The argument escalated and apparently became physical, which caused Megas to veer into a curb and blow out his tire. At some point during this argument, Tanner discarded Megas's glasses.

either willingly or inadvertently; (2) the evidence was favorable to the defendant, either because it was exculpatory or impeaching; (3) the evidence was material either to guilt or punishment; and (4) the failure to discover the allegedly favorable evidence was not the result of a lack of due diligence. See Strickler v. Greene, 527 U.S. 263, 281–82 (1999); Parr v. Quarterman, 472 F.3d 245, 254 (5th Cir. 2006).

## A.

Megas fails to make the threshold showing that the State suppressed the March 3, 2000 letter and that his failure to discover it was not the result of a lack of due diligence. See Parr, 472 F.3d at 254. "Brady and its progeny permit the government to make information within its control available for inspection by the defense, and impose no additional duty on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed." United States v. Pelullo, 399 F.3d 197, 212 (3d Cir. 2005) (citing United States v. Mmahat, 106 F.3d 89, 94 (5th Cir. 1997)); see also Mathis v. Dretke, 124 F. App'x 865, 877 (5th Cir. 2005) ("It is well established that the prosecution has no duty under Brady to give defense counsel guidance as to where in the prosecution's open file to find exculpatory evidence."). This court has held that "[w]hen information is fully available to a defendant at the time of his trial and his only reason for not obtaining and presenting the evidence to the court is his lack of reasonable diligence, the defendant has no Brady claim." United States v. Mulderig, 120 F.3d 534, 541 (5th Cir. 1997) (internal quotations and citations omitted). The TCCA held that the letter could have been obtained by Megas's trial counsel if he had exercised reasonable diligence.

In his attempt to challenge this finding, Megas submitted an affidavit by Greenwood, his trial counsel, which stated that he never saw the letter when he reviewed the file. Greenwood, however, did not expressly state when he reviewed the file. The State submitted an affidavit by Trent, the prosecutor

handling Megas's case, which stated that the letter was kept in the file after its receipt (a short time after March 3, 2000) and that the file was made available to defense counsel under the open-file policy on at least three occasions prior to trial in May 2000. In addition, when the State turned over the file to Megas's habeas counsel, that counsel easily discovered the letter in the file. Given this conflicting evidence and the lack of specificity in Greenwood's affidavit, the TCCA's holding is not objectively unreasonable. Megas has not clearly established that the letter was not in the file after it was received and thus not readily discoverable with reasonable diligence.

B.

Even if this court were to hold that the State suppressed the letter, Megas failed to demonstrate that it was material. See Parr, 472 F.3d at 254. "'[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Bower v. Quarterman, 497 F.3d at 476 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). The TCCA held that the letter was not material, and the district court agreed, at least as to Tanner's denial of the prior assault.

(1) Tanner's denial of the prior assault by Megas

The information contained in the letter regarding Tanner's denial of the prior assault by Megas is immaterial. First, the prior assault is merely collateral as it had no bearing on the kidnapping on the night of Tanner's death, which is the predicate for felony murder here. Under Texas law, kidnapping occurs when a person "intentionally or knowingly abducts another person." TEX. PENAL CODE ANN. § 20.03. "'Abduct' means to restrain a person with intent to prevent [her] liberation by . . . secreting or holding [her] in a place where [she] is not likely to be found." Id. § 20.01(2)(A). "'Restrain' means to restrict a

9

person's movements without consent, so as to interfere substantially with [her] liberty, by moving [her] from one place to another or by confining [her]." Id. § 20.01(1). "Restraint is 'without consent' if it is accomplished by . . . force, intimidation, or deception." Id. § 20.01(1)(A). The State established these elements with the testimony of two independent witnesses, Pruitt and Tyler. Contrary to Megas's argument, the State did not prove kidnapping by showing that Megas was an "evil person" who had previously physically abused Tanner.

Second, the State's reference to the prior assault during its redirect examination of Claire Tanner was brief and elicited only in response to questions posed to her by defense counsel. During its direct examination of Claire Tanner, the State never asked her about the prior assault. On cross examination, however, defense counsel asked her specifically about the prior incident in the following exchange:

> Q: In fact, if I'm not mistaken, on [Tanner]'s birthday or the night after, there was a prior incident of [Tanner] and [Megas] having an altercation, correct?
>
> A: Yes.
>
> Q: And, basically, the altercation was that [Megas] was driving [Tanner], and he had been in an argument and somehow she slapped, hit, or something and he veered off the road and blew out a tire. Correct?
>
> . . . .
>
> A: I don't have personal knowledge. I wasn't there. I know what I was told the next day.

Defense counsel continued to question Claire Tanner about this prior altercation, inquiring about Megas's glasses, which Tanner told her mother that she thought she had thrown into an open field. On redirect examination, the prosecutor posed the following questions to Claire Tanner about the incident:

> Q: Ms. Tanner, a couple weeks prior to the accident, did you see some bruises on [Tanner]?

A: Yes.

Q: And did those bruises cause you any concern?

A: Yes.

Q: Were you ever satisfactorily—were those bruises ever satisfactorily explained to you as to how they had been inflicted?

A: No.

The prosecutor then introduced a picture of Tanner with these bruises as State's Exhibit 40. As the record reveals, the State did not spend a significant amount of time on the prior assault and referenced it only because of defense counsel's questions. Moreover, other than a general allegation, Megas fails to show how his examination of Claire Tanner or other family members would have been "completely different" if he had known about Tanner's denial of the prior assault.

Third, the State's reference to the prior assault during its cross-examination of Megas was brief. The State showed Megas Exhibit 40 and asked him the following questions:

Q: And do you see the bruises on [Tanner's] arm?

A: She has some bruises on her arm.

Q: How did she get those?

A: I have no idea.

Q: So, you don't know whether you inflicted these in that supposed altercation over the glasses?

A: I didn't.

Q: You know that you didn't inflict those?

A: No, sir.

As the record demonstrates, this line of questioning was brief, and once again, only occurred because of defense counsel's prior questioning of Claire Tanner. Megas also fails to show specifically how he could have halted this line of questioning if he had known about the letter.

11

Fourth, neither the State nor defense counsel referenced the prior assault in their closing arguments at trial, further showing the collateral nature of this issue.

Finally, Megas simply fails to demonstrate how this collateral issue, which was briefly referenced in questioning, undermines the confidence in the outcome of the trial. Megas cannot demonstrate that if he had knowledge of Tanner's denial of the prior assault, then he would have been able to show that he was not abusive. Nor can Megas show that the State's characterization of him as being abusive or of Tanner as being a victim of classic abuse is even misleading. Claire Tanner testified that she did not believe Tanner's denial. In addition, Nicholas Tanner and Julia Tanner testified that Tanner and Megas had a troubled relationship and that Megas verbally abused Tanner. Further, Tanner's denial of the prior assault is in stark contrast to the physical evidence—there was a violent argument between Tanner and Megas two weeks before Tanner's death and immediately thereafter bruises appeared on Tanner's arm. Accordingly, Megas fails to show how Tanner's denial of the prior assault is material, and the TCCA's holding is not objectively unreasonable.

(2) Tanner's emotional and physical condition

The information contained in the letter regarding Tanner's emotional and physical condition is also immaterial. Megas argues that knowledge of Tanner's emotional instability would have strengthened his defense to kidnapping, where he contended that he merely restrained Tanner to prevent her from running into the street and injuring herself. Megas, however, generally admits that he does not remember many details from the altercation on the side of the road due to his high level of intoxication. Megas also contends that knowledge of Tanner's physical strength would have bolstered his argument that he could not have physically restrained her. Megas, however, does not mention that Tanner was highly intoxicated that night, which may have affected her ability to fight Megas

off. Megas also consistently ignores that two independent witnesses, Pruitt and Tyler, each testified that they saw Megas hit, kick, and force Tanner into the car shortly before it flipped and caused Tanner's death. Based on this evidence, neither Tanner's emotional nor her physical condition in the weeks prior to her death is material, and thus the TCCA's holding is not objectively unreasonable.

## IV. CONCLUSION

For the foregoing reasons, the denial of habeas relief is AFFIRMED.