# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 5, 2013

No. 12-70001

Lyle W. Cayce
Clerk

VAUGHN ROSS,

Petitioner - Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 5:08-CV-174

Before KING, JOLLY, and GRAVES, Circuit Judges.

PER CURIAM[*]

This request for a certificate of appealability (COA) in this death penalty
case presents arguments that the district court should have considered
affidavits, even though they were not presented in state court; the defaulted
affidavits, which support the petitioner's ineffective-assistance-of-trial-counsel
claim, should have been considered under the authority of *Martinez v. Ryan*, 132

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

S. Ct. 1309 (2012), because of the ineffectiveness of state habeas counsel in failing to produce the affidavits in the state habeas proceedings.

Vaughn Ross was convicted and sentenced to death in Texas state court for the 2001 murders of Viola Ross and Douglas Birdsall during the same criminal episode. Ross was denied habeas relief by the Texas courts. Ross now seeks federal relief. The district court held that the affidavits of trial counsel that Ross presented for the first time in this federal proceeding could not be considered under *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"). The court further held that the state habeas court did not unreasonably apply clearly established federal law when it denied Ross's ineffective-assistance-of-trial-counsel claims on the merits, based on the evidence presented in state court. Ross now seeks a COA from this Court, but because Ross has failed to demonstrate a substantial showing of the denial of a constitutional right or that his claims are adequate to deserve encouragement to proceed further, we DENY his request for a COA.

I.

A.

We first review the facts as presented by the prosecution in state court at the guilt-innocence phase of the trial: Viola's sister, Liza McVade, dated Ross. On January 30, 2001, while McVade was at Ross's apartment with her four-year-old son, Viola telephoned her sister McVade several times. McVade's former boyfriend, Clarence Garner, was with Viola at the time. During one of those conversations, Viola allowed Garner to speak to McVade. Ross knew that McVade was talking to Garner and he was jealous, angry, and upset about McVade's conversation with Garner. Next, McVade called Viola to come and get her. While they were talking, Teresa Williams came to Viola's house and told her that Douglas Birdsall was there, looking for a young, black female prostitute.

No. 12-70001

To accommodate Birdsall, Viola delayed going for McVade, and offered to take Birdsall to someone who would be interested. Viola left with Birdsall and Williams. They dropped Williams off shortly thereafter.

Viola attempted to call McVade from Birdsall's home. Ross answered the telephone, cursed and threatened Viola, and told her not to call again. Ross refused to take McVade and her son home and refused to allow her to use his telephone to call for a ride. Ross then began putting on latex gloves and told McVade to leave "because if I do something, I don't want you around." After using a neighbor's telephone in an unsuccessful attempt to get a ride, McVade and her son walked to her father's house. About fifteen to twenty minutes after McVade had used his telephone, the neighbor heard gunshots, which he reported to the police.

The next day, the bodies of Birdsall and Viola were found inside Birdsall's car, which was parked in a ravine. Both had been shot numerous times and both had died from gunshot wounds to the head.

After discovering the bodies, the police investigated the report of shots fired the night before, to see if there was a connection with the murders. In an alley behind Ross's apartment, the police discovered glass shards and two pools of blood. The larger pool of blood was consistent with Birdsall's DNA profile. A shell casing recovered from the scene matched the shell casings found inside Birdsall's car. A latex glove tip found inside Birdsall's car was tested. Blood on the exterior of the glove tip was consistent with Birdsall's DNA profile. The inside of the glove tip contained DNA consistent with Ross's DNA.

When Ross was interviewed by the police on January 31, he admitted that he was angry with Viola on the evening of January 30, and that he and Viola had argued over the phone when Viola let Garner speak to McVade. The police interviewed Ross again on February 2. In that interview, he admitted that he had argued with Viola and had threatened her. Ross also admitted that he had

3

worn latex gloves that night because he was going to mop his kitchen floor and the bleach hurt his hands. When the police told Ross they were worried that a child might find the murder weapon, Ross told them they did not have to worry because the gun was secure and wouldn't cause any harm. When confronted with the physical evidence – the close proximity of the crime scene to his apartment, the blood and glass found there, the latex glove tip – Ross did not admit killing Viola and Birdsall, but said that if the police had what they said they had, then they had the truth.

With Ross's consent, the police searched his apartment and found two latex gloves and a sweatshirt. The sweatshirt had a very small bloodstain that DNA testing revealed to be consistent with Birdsall's, and Ross's DNA was on the inside of the shirt. Later, when he was in jail, Ross spoke with his mother, who asked him whether he had committed the crime. Ross responded that he "might have."

## B.

At trial, Ross was represented by Floyd Holder, Jr., and Patrick S. Metze. They presented some evidence in support of his defense that the police may have planted the latex glove tip that was found in Birdsall's car. They also presented evidence, including expert testimony, that Ross alone would not have been capable of moving Birdsall's body from the front seat of his car to the back seat, where it was found, and that at least two people had to have committed the murders. They produced Derald Powell, Ross's former roommate, who testified that he had never seen Ross with a gun. They also presented evidence that the murderer would have been covered with blood and glass fragments, but that no blood was found in Ross's apartment or in his car.

The jury was not impressed and convicted Ross of capital murder. Immediately after the guilty verdict, Ross's trial counsel filed a motion for continuance and for a psychiatric examination to determine whether Ross was

No. 12-70001

competent to continue to stand trial.  In the motion, defense counsel stated that Ross had instructed his family and friends not to assist defense counsel at the punishment stage of his trial and that further time was needed to consult with Ross, his family and friends to secure their cooperation.  Defense counsel explained to the court that they questioned Ross's competence because of his insistence that his counsel not call witnesses in his defense at the punishment phase.  The trial court denied the motions, stating that based on its observations, Ross knew what he was doing and was competent to stand trial.

## C.

At the punishment phase of the trial, the State called a jailer who testified that while Ross was in jail awaiting trial, he removed a wristband that all inmates were required to wear.  During a roll call, when asked for the wristband, Ross threw it on the floor.  The jailer testified that he wrote a disciplinary report about the incident because Ross "kind of went crazy" and began cursing him.

The State also presented evidence that Ross pleaded guilty to felony assault and stealing a motor vehicle in 1997, and was placed on probation.  Susie Caddell, a probation officer, testified that Ross told her that the victim was his girlfriend, that they had problems in the past, and that she was stalking him.  Caddell said that Ross told her that the victim attempted to stab him, but he took the knife from her and stabbed her.  According to Caddell, Ross admitted that anger and outrage contributed to the assault.  He expressed no remorse but did say that he would walk away if he had to do it over again.  Ross had successfully completed anger counseling and probation.

Kevin Knobbe, the Missouri police officer who responded to the call about the stabbing, testified that the victim, Regina Carlisle, told him that her boyfriend, Ross, had stabbed her and taken her vehicle.  Carlisle had numerous knife wounds, including a laceration on her neck that could have potentially been life-threatening.  Knobbe testified that he overheard Carlisle say that Ross

told her to give him her neck and that she was going to die. On cross-examination, defense counsel elicited testimony that Carlisle was not admitted to the hospital for her injuries, but was only treated and released.

Ross presented testimony from three witnesses at the punishment phase. The first was Felix Moore, a doctoral student at Texas Tech. Moore testified that he and Ross were fraternity brothers, that Ross studied architecture, and that Ross had paid for his education by working while attending school. Moore said that he had never seen Ross with a gun or knife and had never seen Ross upset, acting violently, or engaging in gangster-type behavior. Moore described Ross as a "peacemaker." According to Moore, Ross was "always pretty calm." He said that Ross drank alcohol, but did not use drugs, and that Ross had girlfriends.

Tanya Robertson also testified for Ross at the punishment phase. Robertson, a Dallas accountant, explained that she knew Ross through her sorority and eventually became roommates with Ross and Derald Powell, who was in law school at the time. According to Robertson, Ross was a diligent student, was not involved with drugs, did not engage in gangster behavior, and rarely drank alcohol. Robertson said that Ross had one girlfriend during the time Robertson was his roommate, and that they had a loving relationship. Robertson described Ross as meek, humble, very calm, very polite, and very nice.

The final punishment phase witness for the defense was Ross's mother, Johnnie Ross, who testified that Ross had three sisters – Valeria, Tiffany, and Michelle. Ross last saw his father, Hershall Sumpton, when he was about eight years old. There were no men living in their home when Ross lived there. Ross was born with pneumonia and suffered from asthma. He attended public school, where he ran track and played football. He was involved in the Cub Scouts and Boy Scouts. He attended inner city schools until junior high, when the family moved to a St. Louis suburb, where they lived in a single-family home in a predominantly white community with racially mixed schools. There were no

guns in their home. Ross was not familiar with weapons and he did not hunt. Ross went to church, where his step-grandfather was the preacher, three or four times a week, until he went to college. Ross had a small, racially-mixed group of friends in high school, who were "good kids." Ross did not have trouble with the law as a juvenile, other than a single curfew violation. He did not get into trouble at school. His mother was not aware of any drug or alcohol use, and Ross was not involved in any gang activity. As a teenager, Ross had a job at a country club. His mother described him as a quiet, calm, laid-back person. After he graduated from high school, Ross attended Central Missouri State College, where he received an Associate of Science degree and a Bachelor of Science degree. While in college, Ross did not use drugs and drank alcohol only socially. He was active in his fraternity and was president of his chapter during his senior year. After college, Ross had jobs with several architectural firms. According to his mother, Ross was never in trouble with the law until the incident with his girlfriend in 1997. After that incident, Ross went to Texas Tech to continue his education. While at Texas Tech, Ross paid for his education and did not have any mental problems. Ross's mother said that she did not know anything about Ross being in a car wreck in the 1990s.

At the conclusion of her testimony, defense counsel asked Ross's mother if she wanted to say anything to the jury. She lashed out at the jury, angrily, saying:

> I get to tell these people that I think they have done a horrible job and that they have been unjust to me and my family and my son.

> I get to tell these people that I do not think you even considered or even tried to consider all the evidence that pointed toward this situation.

> I think you made your minds up from the beginning and you decided that because you saw, as they hollered and shouted at us,

No. 12-70001

Vaughn Ross sitting there, Black, that that was it. And you made a decision right then and there.

You didn't consider what you did to my family.

I understand, and I am so sorry about the Birdsalls, about the Rosses, the McVades. But you didn't consider that my son was innocent. You didn't consider what it would do to my son's life or to my family's life.

And if I appear angry, it's because I am. Because I don't think you gave him a chance. And I don't think you gave him a chance from the very beginning.

When defense counsel asked her if she wanted the jury to give her son a life sentence, she responded: "No, I do not. That would be foolish for me to want that." When pressed, she said that neither choice was good, but that she "would prefer life over death."

The jury answered affirmatively the special punishment issues on future dangerousness and whether Ross caused or anticipated the deaths of the victims. It answered negatively the special issue on mitigating circumstances. Accordingly, the trial court imposed the death sentence.

## II.

## A.

Ross next directly appealed his conviction and sentence to the state appellate court. In this connection, the trial court appointed Richard Wardroup to represent Ross on direct appeal. On May 5, 2004, the Texas Court of Criminal Appeals affirmed his conviction and sentence. *Ross v. State*, 133 S.W.3d 618 (Tex. Crim. App. 2004). Ross did not file a petition for a writ of certiorari.

The next step in the proceedings occurred while his direct appeal was pending. The trial court appointed counsel to represent Ross in state habeas proceedings, and Ross filed his state habeas application on March 26, 2004. In his state habeas application, Ross asserted that his trial counsel rendered

ineffective assistance by failing to investigate and present (1) evidence of the criminal history of Regina Carlisle, the victim of Ross's 1997 assault, to impeach the State's punishment phase evidence; and (2) mitigating evidence about Ross's background. Ross alleged that if counsel had investigated Carlisle's criminal history, they would have learned that she had an extensive criminal history which included fraudulent use of a credit card, car theft, and assaulting a boyfriend by hitting him with her car, and that she had been convicted of manslaughter for shooting another boyfriend who later died from complications. Ross argued that this evidence, together with evidence that Carlisle had a gun in the car the night Ross allegedly assaulted her, that she was mentally unstable, and that she had been stalking Ross, would have placed the entire incident in a different light which had tangible, but untapped, mitigating potential. He further alleged in his state habeas petition that, as a result of counsel's failure to investigate, valuable evidence that undercut the future dangerousness issue was not presented to the jury, and Carlisle's hearsay statements were left unimpeached by her previous assaultive behavior and crimes of moral turpitude. Ross also alleged that trial counsel's mitigation investigation consisted of a single interview with Ross's mother and two of his sisters for no more than an hour. Finally, he alleged that counsel had failed to uncover additional mitigating evidence, described in the affidavits of licensed private investigator Lisa Milstein and his sister, Valeria Martin, which were attached as exhibits to his state habeas application.

In her affidavit, Milstein summarized proposed testimony from seven potential witnesses:

(1) Ronnie Martin: According to Milstein, Ronnie Martin told her that Viola's father, Chester, did not want Ross to get the death penalty. However, Chester would not speak with Milstein.

No. 12-70001

(2)  Lydia Davis:  Milstein stated that she interviewed Davis, Ross's maternal grandmother, and that Davis was willing to help but was never interviewed by anyone associated with Ross's defense.  According to Milstein, Davis attributes all of Ross's problems to his lack of a father figure and to his mother's refusal to help him contact his father.

(3) Marsha Green:  Milstein stated that she interviewed Green, who dated Ross for three years after he graduated from college, and that Green was willing to help but was not interviewed by Ross's defense team.  According to Milstein, Green said that Ross was quiet, not jealous or possessive, was nice to her, never raised his voice or a hand to her, and had high expectations from life.

(4) Michelle Ross:  Milstein stated that she interviewed Michelle Ross, Ross's youngest sister.  According to Milstein, Michelle was interviewed by Ross's trial counsel in the company of her mother and sister, Valeria.  The interview was brief and focused on the evidence against Ross, barely touching on Ross's early life.  Michelle did not testify at trial.

(5) Regina Carlisle:  Milstein stated that she interviewed Carlisle, Ross's ex-girlfriend and the victim of the 1997 assault to which Ross pleaded guilty. According to Milstein, Carlisle made her living by stealing cars, but Ross was not involved in the thefts.  Carlisle also described shooting a boyfriend who later died from his wounds.  On the night Ross assaulted her, she had a handgun in her car.  Milstein said that Carlisle was not interviewed by the defense team and indicated that she would have spoken to them.

(6) Valeria Martin:  Valeria was present at Ross's trial but did not testify. Milstein stated that Valeria told her that her mother would not allow the children to discuss their childhood, and so they were unable to speak freely when interviewed by Ross's defense counsel in the presence of their mother.  Valeria believed that Ross suffered from the fact that he had no father figure and resented his mother because she would not help him find his father.

No. 12-70001

(7) Tiffany Ross:  Milstein stated that she interviewed Ross's sister, Tiffany, who said that she would have been willing to speak with defense counsel and testify at trial.  According to Milstein, Tiffany described Ross as stubborn and stated that his feelings were easily hurt and he was picked on in school because he was short.

In her affidavit, Valeria stated that she, her sisters, and her mother met with Ross's defense counsel on one occasion for approximately an hour.  They were not interviewed separately.  Valeria believed the family would have been more open if they had been interviewed individually, because they did not feel free to talk in the presence of their overbearing mother, who had always told them not to tell their business to anyone.  She stated that Ross was a very quiet, sensitive child.  He wanted affection from their mother, but the mother is not the affectionate type.  Ross was unable to gain that attention elsewhere.  All of Ross's siblings had different fathers, but Ross was the only one who did not have a relationship with his father.  He wanted a male figure in his life, and always resented his mother for not talking to him about his father and trying to involve his father in his life.  She stated that there was a side of her brother that the jury did not hear about:  he was popular in high school and never got in trouble; he did not use or abuse drugs or alcohol, was active in his fraternity and was considered to be a good person by everyone who knew him, and was kind and sensitive.

Ross alleged that as a result of counsel's inadequate investigation, the jury did not get an accurate picture of his life history that could have humanized him and led to an understanding of his need for a close relationship, but inability to have one.

### B.

The state trial court was not impressed by Ross's habeas petition and on July 3, 2007, it adopted the State's proposed findings of fact and conclusions of

11

No. 12-70001

law and recommended that the Texas Court of Criminal Appeals deny relief. *Ex parte Ross*, No. 2001-435,653-A.  On appeal of the denial of habeas relief, Ross next filed a motion to remand the case to the trial court because his counsel did not receive both the trial court's order to submit proposed findings of fact and conclusions of law and the State's proposed findings and conclusions.  The Texas Court of Criminal Appeals granted the motion and ordered the trial court to re-examine the findings it had entered in the light of Ross's proposed findings and conclusions.  *Ex Parte Ross*, No. WR-60,294-01 (Tex. Crim. App. Oct. 10, 2007).

On remand, the habeas trial court re-entered the same findings of fact and conclusions of law and again recommended that the Court of Criminal Appeals deny relief on the merits:  With respect to the claim of ineffective assistance for failing to investigate the criminal history of Regina Carlisle, the state habeas court found that Ross did not present evidence that defense counsel failed to investigate Carlisle's criminal history; that Ross failed to demonstrate how defense counsel could have introduced evidence of Carlisle's criminal history or how it would have been admissible because she did not testify; that Ross's version of the events was before the jury through the testimony of his probation officer; and that Ross had pleaded guilty to assaulting Carlisle.  It concluded that Ross had not demonstrated either that trial counsel's performance was deficient or that Ross was prejudiced in this respect.

Next, with respect to Ross's claim that counsel were ineffective by failing to investigate and present mitigating evidence, the state habeas court found that Ross failed to allege any facts establishing deficient attorney performance.  Moreover, and in particular, Ross failed to allege facts to challenge:  that Ross had previously insisted that no punishment witnesses be called on his behalf; that Ross dissuaded some punishment witnesses from testifying on his behalf; that Ross advised his friends and family not to cooperate with defense counsel; that Ross's mother had told defense counsel to leave her alone; and that the

12

No. 12-70001

additional mitigating evidence was neither powerful nor compelling, but was similar to the evidence that indeed was presented at trial. The court concluded that Ross had failed to show that counsel's punishment investigation was deficient and that Ross had obstructed counsel's attempts to investigate and present a punishment case. The court further concluded that Ross was unable to show that, if the newly proffered evidence had been presented and explained, there is a reasonable probability that the result of the sentencing proceeding would have been different.

On January 23, 2008, the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions and denied relief. *Ex Parte Vaughn Ross*, No. WR-60,294-01, 2008 WL 217987 (Tex. Crim. App. January 23, 2008).

### III.

### A.

We now turn to the federal habeas proceedings. On August 27, 2008, Don Vernay and Richard L. Wardroup were appointed to represent Ross in federal habeas proceedings. Ross filed a petition for federal habeas relief on January 11, 2009. In his federal habeas petition, Ross alleged, as he had in his state habeas petition, that trial counsel were ineffective for failing to investigate Regina Carlisle's criminal history and for failing to conduct a mitigation investigation. In addition to the affidavits of Milstein and his sister Valeria Martin that were attached to his state habeas petition, Ross attached to his federal habeas petition the affidavits of his trial counsel, Floyd Holder and Patrick Metze. The affidavits of trial counsel had not been presented in state court.

In his affidavit, Holder stated that he was retained by Ross's family. He did not ask the court to provide a mitigation investigator and did not retain one. He stated that he was instructed by Ross and his family that the focus of the investigation was on acquittal. Therefore, he spent very little time attempting to investigate the facts relative to the punishment phase. He did not send an

13

investigator to Missouri to investigate Ross's psycho-social history.  He stated that his professional opinion is that blaming someone remote in time and place for the way an accused turns out does not work to mitigate punishment unless the evidence shows that the accused is less culpable because of the condition.  He stated that he did not investigate Regina Carlisle's background and did not know that she had a history of shooting a prior boyfriend or that she had a handgun in her vehicle on the night that the assault occurred.  He also did not know that Carlisle had engaged in theft of automobiles and other types of fraud.  He said that Metze was appointed about a month before individual voir dire began, that Metze was primarily responsible for preparation for the punishment phase, and that he did not authorize Metze to retain any experts or investigators to assist in his preparation.  He said that he and Metze met with Ross's family shortly before the trial began and that he recalled visiting with the family twice and communicating with them throughout the trial.

In his affidavit, Metze stated that he spent most of the time between his appointment and the beginning of trial becoming familiar with the facts of the case and the investigation that Holder had done.  Holder asked him to prepare for the punishment phase, but he did not have a mitigation investigator to assist him.  He did not have time to travel to Missouri to meet with Ross's family, friends, teachers, and coaches prior to starting jury selection. He met with some members of Ross's family in Holder's Lubbock office, but the family was not particularly forthcoming about Ross's psycho-social history.   They were particularly obstinate when questioned about the specifics of Ross's youth. Metze stated that he did not investigate the character and criminal history of Regina Carlisle.  Although he discussed with Holder the possibility of doing a more thorough mitigation investigation, he was not able to do so due to trial preparation.  He interviewed several witnesses who might testify for Ross: Ross's mother and sister, and Felix Moore and Derald Powell, Ross's fraternity

14

brothers.  He also spoke to Tanya Robertson, who testified for Ross at the punishment phase.  In a motion for continuance filed after the conclusion of the guilt-innocence phase, he represented to the court that Ross had instructed family and friends not to cooperate with the presentation of punishment evidence.  He stated that this instruction limited the witnesses who were willing to testify at trial, but it did not affect the investigation and development of witnesses who might have testified.  He stated that he solicited the assistance of Vince Gonzales, a mitigation investigator, who volunteered to assist with punishment phase witnesses.  However, Gonzales, although qualified by training and experience, was not asked to do any investigation into the mitigation presentation in Ross's case.

In his brief in support of his federal habeas petition, Ross argued that a thorough investigation of Carlisle's criminal history would have allowed the defense to impeach the State's punishment phase evidence about the 1997 assault.  He also argued that the failure to locate and present mitigating witnesses was particularly prejudicial, because those witnesses would have been able to provide some context to Ross's life and his relationships, as well as elaborate on his good character.  He contended that the jury should have heard that the father of one of the victims did not want him to get the death penalty, and should have heard about the peaceful side of his character, from women with whom he had maintained relationships in the past.  Finally, he argued that the jury should have been told of his dysfunctional family.

The State argued that the affidavits of trial counsel were not presented to the state habeas court and were therefore unexhausted and procedurally barred from the federal court's consideration.  In response, Ross argued that the matters raised in trial counsels' affidavits were exhausted in state court because the affidavits merely supplemented the evidence of ineffective trial counsel presented in the state habeas proceeding, but did not fundamentally alter the

No. 12-70001

ineffective trial counsel claim presented.  He did *not* argue that state habeas counsel were ineffective for failing to obtain and present the affidavits of trial counsel to the state habeas court.

## B.

The district court, in its ruling, agreed with the State and refused to consider the affidavits because they were not submitted to the state habeas court, citing *Cullen v. Pinholster*.  The parties thereafter submitted proposed findings of fact and conclusions of law, and the district court heard arguments on May 1, 2009.  On December 1, 2011, the district court denied federal habeas relief and denied a COA.  *Ross v. Thaler*, No. 5:08-CV-174 (N.D. Tex. Dec. 1, 2011).  With respect to the claim of ineffective assistance in failing to investigate the criminal history of Regina Carlisle, the district court held that Ross had not demonstrated that the state court's denial of his ineffective assistance of counsel claim was contrary to, or an unreasonable application of, clearly established Supreme Court law.  With respect to the mitigating evidence ineffective assistance claim, the district court stated that Ross had presented little or no evidence to support his claim that defense counsel failed to investigate and present mitigating evidence.  The court noted that, although an investigator for Ross had interviewed seven witnesses and summarized their evidence in a statement for the state habeas court, only one of those witnesses, Valeria Martin, signed a sworn affidavit stating that she would have testified at trial if she had been asked to do so.  The district court observed that the state habeas court had compared the evidence actually presented at the punishment hearing with Ross's proposed additional mitigating evidence and had determined that the additional evidence was neither powerful nor compelling, but was similar to the evidence introduced by his attorneys.  Thus the district court concluded that Ross's arguments that his case was comparable to *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Williams v. Taylor*, 529 U.S. 362 (2000), were specious because

No. 12-70001

Ross's additional mitigation evidence – that he felt abandoned by his father and wanted a male role model, that the father of one of the victims did not want him to be sentenced to death, that his mother was unable to control her anger, that Ross and his sisters practically raised themselves, that Ross's former girlfriend found him to be thoughtful and mild-mannered, and that his former girlfriend and assault victim, Regina Carlisle, had a violent criminal past – did not rise to the level of powerful, compelling evidence of abandonment, sexual molestation, physical abuse, criminal neglect, diminished mental capacity, foster care, alcoholism, and homelessness omitted from the punishment phases in *Williams* and *Wiggins*. The district court therefore held that Ross had not demonstrated that the state court's adjudication of his claim was contrary to or an unreasonable application of clearly established Supreme Court law.

## IV.

Now before us, Ross requests a COA "on the issue of the failure of state habeas counsel to provide evidence in support of their *Wiggins* [ineffective assistance of trial counsel] claim." It is important to note what Ross does not request: He does *not* request a COA with respect to the district court's denial of his claim that the state habeas court unreasonably applied clearly established law when it rejected his ineffective-assistance-of-trial counsel claim. In other words, Ross does *not* argue that the district court erred by denying habeas relief based on the evidence presented to the state habeas court, which did not include trial counsels' affidavits. Accordingly, the *only* question presented to us in this COA application is whether Ross may appeal the district court's refusal to consider trial counsels' affidavits – introduced for the first time in the federal proceeding – when ruling on his ineffective-assistance-of-trial counsel claim.

## A.

To obtain a COA, Ross must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this

standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. In making the decision whether to grant a COA, this Court's examination is limited to a "threshold inquiry," which consists of "an overview of the claims in the habeas petition and a general assessment of their merits." *Id.* at 327, 336. We cannot deny a COA because we believe the petitioner ultimately will not prevail on the merits of his claims. *Id.* at 337. On the other hand, "issuance of a COA must not be *pro forma* or a matter of course." *Id.* "While the nature of a capital case is not of itself sufficient to warrant the issuance of a COA, in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (brackets, internal quotation marks, and citations omitted).

## B.

### 1.

In seeking our authority for this appeal, Ross's sole focus is on the failure of state habeas counsel. Ross argues that the negligent failure of state habeas counsel to obtain affidavits from state trial counsel deprived him of a full and fair hearing on his ineffective-assistance-of-trial-counsel claims in both state and federal court. He cites the Supreme Court's recent decision in *Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012) (holding that ineffective "assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial"), and contends that Texas is a jurisdiction in which a petitioner may raise a claim of ineffective

18

No. 12-70001

assistance of trial counsel only in state habeas proceedings – not in a direct appeal of his conviction. Ross asserts that the failure of state habeas counsel to interview or obtain affidavits from trial counsel is the type of ineffective habeas counsel contemplated in *Martinez*. He asserts that because of this failure of habeas counsel, he did not have a full and fair hearing of his claims in the state habeas court, and consequently, the district court's reliance on *Cullen v. Pinholster* as a basis for refusing to consider the affidavits of trial counsel disregarded the holding in *Martinez*. According to Ross, *Pinholster*'s strict limitation on new evidence in the federal habeas proceeding presupposes that a fair and complete state court record is before the federal court, which is not the case here. He therefore contends that the failure of state habeas counsel to present trial counsel's affidavits in state court is a procedural default that should now be excused.

2.

In response, the State points out that before the district court, Ross argued *only* that all state remedies concerning the affidavits had been exhausted and could be considered by the district court, because they merely supplemented the evidence offered in the state habeas proceeding, but did not fundamentally alter the claim presented. The State therefore contends that Ross has forfeited his argument that state habeas counsel were ineffective for failing to obtain and present the affidavits of trial counsel to the state habeas court, and that the ineffective assistance of state habeas counsel should serve as cause to excuse this default and allow consideration of the affidavits for the first time in federal court. The State contends further that *Martinez v. Ryan* is inapplicable to habeas proceedings arising in Texas because Texas does not restrict ineffective trial counsel claims to habeas proceedings. Nor should it otherwise apply to the circumstances of Ross's case: Ross's state habeas counsel did not procedurally default the ineffective-assistance-of-trial-counsel claims; further, neither did the

state or federal courts apply a procedural bar to foreclose review of those claims. Instead, the district court only refused to consider the newly presented affidavits based upon the Supreme Court's specific holding that federal review is limited to the record that was before the state habeas court. *Pinholster*, 131 S. Ct. at 1398. Furthermore, *Martinez* applies to *claims*, not to *evidence supporting claims*. Finally, the State contends that even should *Martinez* apply, and state habeas counsel's deficient performance should serve as cause to excuse the failure to present the affidavits in state court, Ross still cannot establish prejudice because the underlying claims of ineffective assistance of trial counsel are not "substantial." *See Martinez*, 132 S. Ct. at 1318 (to overcome procedural default of ineffective assistance of trial counsel claim, "a prisoner must also demonstrate that the . . . claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit"). The State contends that even if we were to consider the affidavits of trial counsel, the affidavits would at most support – but not prove – that trial counsel performed deficiently. According to the State, neither affidavit bears on whether trial counsel's ineffectiveness prejudiced Ross's defense; nor does Ross even suggest how reasonable jurists could debate the controlling deference owed to the state court's findings on prejudice.

## C.

The State is correct that Ross did not argue to the district court that the ineffectiveness of state habeas counsel excused the failure to produce the affidavits to the state habeas court. As we have already noted, Ross only argued in the district court that the affidavits should be considered procedurally exhausted in state court because they did not fundamentally alter the claim presented in state court. He did *not* argue that the failure to present the affidavits in state court should be excused because of the ineffective performance of state habeas counsel.

No. 12-70001

The general rule, routinely applied except in rare circumstances not present here, is that we will not consider arguments raised for the first time on appeal. *See Bower v. Quarterman*, 497 F.3d 459, 475 (5th Cir. 2007). Because Ross did not argue in the district court that the affidavits should have been admitted on the basis of his state habeas counsel's ineffective performance we decline to consider that argument now.

We further find that reasonable jurists could not disagree with the district court's application of *Pinholster*. In *Pinholster*, the Supreme Court expressed itself clearly when it stated:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.*, the record before the state court.

*Pinholster*, 131 S. Ct. at 1398.

The Court also rejected a suggested exception to the state-record-only rule – that new evidence may be introduced in the federal proceeding as long it "supports" an adjudicated claim:

> The State . . . asserts that some of the evidence adduced in the federal evidentiary hearing fundamentally changed Pinholster's claim so as to render it effectively unadjudicated. Pinholster disagrees and argues that the evidence adduced in the evidentiary hearing simply supports his alleged claim.
>
> We need not resolve this dispute because, even accepting Pinholster's position, he is not entitled to federal habeas relief. Pinholster has failed to show that the California Supreme Court unreasonably applied clearly established federal law on the record before that court, which brings our analysis to an end. Even if the evidence adduced in the District Court additionally supports his

21

No. 12-70001

claim, as Pinholster contends, we are precluded from considering it.
*Id.* at 1402 n.11 (citations omitted).

We are further unpersuaded by Ross's argument that *Pinholster* applies only when a fair and complete state court record is before the federal court. As we recently held in *Lewis v. Thaler*, 701 F.3d 783, 791 (5th Cir. 2012), when a federal habeas petitioner's claims have been adjudicated on the merits in state court, as Ross's ineffective assistance of trial counsel claims have been, "§ 2254 limits our review to the record that was before the state court." Accordingly, the district court correctly refused to consider trial counsels' affidavits, which were presented for the first time in the federal proceeding.

In rendering our decision we do not reach Ross's argument that the Supreme Court's decision in *Martinez* created a routine *Pinholster* exception – thus allowing a federal habeas court to consider evidence that was not presented in state court – for cases in which a petitioner is denied a full and fair hearing in the state habeas courts because of the ineffectiveness of his state habeas counsel. Because Ross did not argue in the district court that his state habeas counsel was deficient for failing to obtain affidavits from state trial counsel, we need not address the applicability of *Martinez*.

Because the district court's refusal to consider the affidavits is fully supported by *Pinholster*, its decision is not debatable and the issue is not adequate to deserve encouragement to proceed further. We therefore deny Ross's request for a COA.

V.

To sum up: Ross did not argue in the district court, and thus forfeited, his argument that, notwithstanding *Pinholster*, the district court could consider trial counsels' affidavits on the grounds that ineffective assistance of state habeas counsel excused the failure to produce those affidavits to the state habeas court. Alternatively, if we assume that the argument is not forfeited, the district court's

refusal to consider the affidavits of trial counsel is not debatable or wrong, because *Pinholster* dictates that result. We do not reach Ross's argument that *Martinez* applies to this case. The bottom line: Because Ross has failed to make a substantial showing of the denial of a constitutional right, his application for a COA is

DENIED.